1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10          San Francisco Division

11   PIERRY, INC.,                                Case No. 17-cv-03074-LB

12          Plaintiff,

13   v.                                           **ORDER (1) GRANTING IN PART AND
                                                  DENYING IN PART PLAINTIFF'S
14   THIRTY-ONE GIFTS, LLC,                       MOTION TO DISMISS AND (2)
                                                  GRANTING DEFENDANT'S MOTION
15          Defendant.                            TO DISMISS**

16                                                Re: ECF Nos. 53, 56

17                            **INTRODUCTION**

18          The parties are the plaintiff/counter-defendant Pierry, Inc., which provides software solutions

19   and support for companies,[1] and defendant/counter-claimant Thirty-One Gifts, which sells

20   consumer goods directly to consumers and through appointed consultants who sell to consumers.[2]

21   Pierry provided Thirty-One Gifts with a software platform and access to the Sales Force

22   Marketing Cloud ("SFMC") for customer data.[3] The parties had a contract that governed their

23   business arrangement: a "Master Services Agreement" ("MSA") supplemented by two

24
25

---

[1] First Amend. Compl. ("FAC") – ECF No. 51 at 2 (¶ 3). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] First Amend. Counterclaims ("FACC") – ECF No. 49 at 2 (¶ 4).

[3] FAC – ECF No. 51 at 3 (¶ 8).

"Statements of Work."[4] After Pierry allegedly failed to send a significant portion of marketing emails for an April 2017 sales event, Thirty-One Gifts terminated the contract by sending a formal notice of Termination.[5] Pierry demanded immediate payment of past-due invoices totaling $289,772.20,[6] and Thirty-One Gifts refused to pay them on the ground that they were not the sums due under the contract and instead were for extra work hours that Thirty-One Gifts did not approve.[7] Pierry then suspended Thirty-One Gifts' access to the SFMC application and account, which meant that Thirty-One Gifts could not communicate with its sales consultants and customers or enroll new customers.[8]

Pierry and Thirty-One Gifts both claim a breach of the contract. Pierry's claims are (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) declaratory judgment.[9] Thirty-One Gifts' counterclaims are (1) breach of contract, (2) declaratory judgment, (3) violation of California's Computer Data Access and Fraud Act, Cal. Pen. Code § 502, (4) conversion, (5) intentional interference with prospective economic advantage, and (6) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200.[10]

Both parties filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). Pierry moves to dismiss Thirty-One Gifts' counterclaims three through six[11] Thirty-One Gifts moves to dismiss Pierry's second claim for breach of the implied covenant of good faith and fair dealing.[12] The court grants Thirty-One Gifts' motion, grants Pierry's motion to dismiss the UCL claim, and otherwise denies Pierry's motion.

---

[4] *Id.* at 2 (¶ 4); Master Service Agreement ("MSA"), Ex. 1 – ECF No. 51 at 10–16; 2016 Statement of Work ("SOW"), Ex. 2 – ECF No. 51 at 18–19; 2017 SOW – ECF No. 51 at 21–22.

[5] FACC – ECF No. 49 at 10–14 (¶¶ 47–71).

[6] FAC – ECF No. 51 at 3 (¶ 9); FACC – ECF No. 14 (¶ 73).

[7] FACC – ECF No. 49 at 14 (¶ 75).

[8] *Id.* at 14–15 (¶¶ 77–83).

[9] *See generally* FAC – ECF No. 51.

[10] *See generally* FACC – ECF No. 49.

[11] The cover page to Pierry's motion is styled a motion to dismiss "counts one, three, four, five and six." Mot. – ECF No. 56 at 1. The motion does not argue for dismissal of claim one, and Pierry clarifies in its reply brief that it does not seek dismissal of claim one. Reply – ECF No. 63 at 4.

[12] Mot. – ECF No. 53 at 1.

## 1. The Parties

Pierry provides software solutions and support to its clients in technology, finance, accounting, engineering, and government industries.[13] It resells SFMC software applications and licenses and "advertises itself as one of the largest SFMC implementers, integrators, and consultants in the world."[14]

Thirty-One Gifts sells "consumer products," both directly to consumers and through its network of "tens of thousands of independent hostesses/consultants" who sell to consumers.[15] Its sales are "largely sourced and fulfilled online."[16] It relies on "its electronic platforms to advertise, to communicate with its consultants and consumers, to receive orders, to confirm orders, and to communicate regarding the shipping of products."[17] It "contracts with third-party vendors" for online digital marketing and communications services.[18] It contracted with C.Trac — a SFMC application vendor — for its email and digital marketing services.[19] In 2016, Pierry purchased C.Trac, and as a result, Pierry became Thirty-One Gifts' SFMC vendor.[20]

## 2. The Master Services Agreement ("MSA")

On September 1, 2016, Pierry and Thirty-One Gifts signed the MSA, which sets forth "the general terms and conditions between the parties."[21] It defines the "services" that Pierry would

---

[13] FAC – ECF No. 51 at 2 (¶ 3); MSA, Ex. 1 – ECF No. 51 at 10–16.

[14] FACC – ECF No. 49 at 4 (¶ 14).

[15] FAC – ECF No. 51 at 2 (¶¶ 4–5).

[16] *Id.* at 3 (¶ 8).

[17] *Id.*

[18] *Id.* (¶ 10).

[19] *Id.* (¶ 11).

[20] *Id.* (¶ 12).

[21] FACC – ECF No. 51 at 4 (¶ 16).

provide as the "implementation, integration, consulting, and/or similar services described in a Statement of Work. . . ."[22]

Section 2 of the MSA governs fees and payments. Section 2.1 obligated Thirty-One Gifts to "pay all fees specified in all Order Forms and/or SOWs executed under the MSA" and "reimburse Pierry Software for all reasonable, pre-approved travel and pre-approved out-of-pocket expenses incurred in connection with Pierry Software's performance of Services."[23] Section 2.2 governs overdue payments:

> [Thirty-One Gifts'] failure to timely pay any fees and expenses that are not the subject of a good faith dispute of which [Thirty-One Gifts] notifies Pierry Software in a detailed writing ("Undisputed Fees") shall constitute a material breach of the Agreement. If any amounts for which [Thirty-One Gifts] is responsible are overdue, then Pierry Software may provide [Thirty-One Gifts] with written notice of the same (a "Late Notice"). If [Thirty-One Gifts] fails to pay all overdue amounts within 10 business days after [Thirty-One Gifts'] receipt of the Late Notice, then Pierry Software may, in addition to any of its other rights or remedies, suspend provision of Services until all overdue amounts are paid in full.[24]

Section 3 addresses "proprietary rights."

> 3.1 Pierry Software's Intellectual Property. Subject to the limited rights expressly granted hereunder, Pierry Software reserves all rights, title, and interest in and to the Services, including all related patent, copyright, trademark and other intellectual property rights. No rights are granted to [Thirty-One Gifts] hereunder other than as expressly set forth herein.

> 4.2 [sic] [Thirty-One Gifts'] Intellectual Property. All content created by [Thirty-One Gifts], or by Pierry Software for [Thirty-One Gifts], during performance of the Services, including without limitation email templates, newsletters, distribution lists, links, images, graphs and photos (the "Work Product"), shall be the sole and exclusive property of [Thirty-One Gifts]. Pierry Software agrees that it will not use the same Work Product created for [Thirty-One Gifts] under this Agreement for another Pierry Software customer; provided, however, that nothing in the preceding sentence shall be interpreted to preclude Pierry Software from using the same functionality, format, code, design, concepts, workflows, integrations or other ideas represented in the Work Product.[25]

---

[22] Ex. 1, MSA – ECF No. 51 at 10.

[23] Id. at 11.

[24] Id.

[25] Id.

Section 5.2 contains Pierry's "Software Warranties:" "Pierry Software represents and warrants that the Services will be performed in a professional and workmanlike manner in accordance with generally accepted industry standards."[26]

Section 7.1 limited either party's liability in a lawsuit "arising out of or related to the agreement:"

> EXCEPT WITH RESPECT TO THE INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 7, IN NO EVENT SHALL EITHER PARTY'S LIABILITY ARISING OUT OF OR RELATED TO THE AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE AGGREGATE SUMS PAID BY [THIRTY-ONE GIFTS] IN THE 12 MONTHS PRECEDING THE INCIDENT GIVING RISE TO LIABILITY; PROVIDED, HOWEVER, THAT IN NO EVENT SHALL [THIRTY-ONE GIFTS'] LIABILITY TO PIERRY SOFTWARE BE LESS THAN THE SUM OF ALL OUTSTANDING FEES AND EXPENSES OWED BY [THIRTY-ONE GIFTS] PLUS ALL INTEREST AND COLLECTION COSTS ASSOCIATED THEREWITH. NOTWITHSTANDING THE FOREGOING, [THIRTY-ONE GIFTS'] EXCLUSIVE REMEDY, AND PIERRY SOFTWARE'S ENTIRE LIABILITY, FOR ANY BREACH OF THE WARRANTIES IN SECTION 5.2 IS LIMITED TO RE-PERFORMANCE OF THE SERVICES. IF PIERRY SOFTWARE IS UNABLE TO RE-PERFORM THE SERVICES AS WARRANTIED WITHIN 30 DAYS OF WRITTEN NOTICE OF BREACH, [THIRTY-ONE GIFTS] SHALL BE ENTITLED TO RECOVER THE FEES PAID TO PIERRY SOFTWARE FOR THE DEFICIENT SERVICES.[27]

Section 7.2 of the MSA excludes consequential and related damages: "IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABIILITY TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, CONSEQUENTIAL, EXEMPLARY, OR SPECIAL DAMAGES OF ANY KIND OR NATURE HOWEVER CAUSED (INCLUDING BUT NOT LIMITED TO LOST PROFITS AND LOSS OF GOODWILL), WHETHER IN CONTRACT, TORT OR UNDER ANY THEORY OF LIABILITY, WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES."[28] The MSA provides for an award of attorney's fees and costs to the prevailing party in any lawsuit "arising out of or relating to the [MSA] or its subject matter."[29]

---

[26] Id. at 13.

[27] Id. at 14 (CAPS in original).

[28] Id. (CAPS in original).

[29] Id. at 15 (§ 9.8).

Section 8 governs the term and termination of the contract: "This MSA commences on the Effective Date and continues until the termination or expiration specified in all Order Forms and/or of the terms specified in the SOWs . . . ."[30]

### 3. The September 1, 2016 Statement of Work

At the same time that they signed the MSA, the parties signed a "Statement of Work," which contained this "Description of Services":

> New software configuration including landing page and email utilization, including Pierry Software Account and direct 24/7/365 Salesforce Marketing Cloud support.[31]

Under the Statement of Work, Thirty-One Gifts bought from Pierry, among other things, "the SFMC Professional Edition software application and a User License for the software application." It also bought a "'Private [Internet Protocol]/Dedicated [Internet Protocol]' for hosting Thirty-One Gifts' account in the SFMC software."[32] The FACC explains:

> That Internet Protocol and the address associated with it is critical. In email communications, one of the greatest barriers to communicating is the "warming-up" of an internet protocol address because a recipient email server has opportunity to reject an incoming message. The warming-up period can last weeks or months and consists of repeated pings on the recipient server until the recipient server recognizes and accepts incoming messages. Thirty-One Gifts' ownership of the warmed-up Internet Protocol address associated with its SFMC account thus was critical to the contract because Thirty-One Gifts would need use of that Internet Protocol address if Thirty-One Gifts ever needed to migrate to a different digital marketing vendor.

The Statement of Work "separately defined certain services relating to the purchased software application, license, and IP, including configuring a website landing page and email utilization statistics."[33] It included an "ongoing support retainer" of 125 hours per month for six months and gave Thirty-One Gifts the "option of reassessing the total

---

[30] *Id.* at 14 (§ 8.1). The term in the September 1, 2016 Statement of Work was September 18, 2016 to September 17, 2018; Thirty-One Gifts could renew for an additional three-month term with 30 days' notice before the expiration date. Ex. 2, SOW – ECF No. 51 at 18.

[31] FACC – ECF No. 49 at 5 (¶¶ 25–26); Ex. 2, SOW – ECF No. 51 at 18.

[32] FACC – ECF No. 49 at 5 (¶ 26).

[33] *Id.* (¶ 27).

1   number of monthly hours needed after 6 months."[34] If Thirty-One Gifts "chooses to

2   maintain the number of hours through the remaining 6 months of the retainer contract," the

3   parties "will discuss reducing the hourly rate for the remainder of the contract year."[35]

4

5   **4.  The February 2, 2017 Statement of Work**

6        On February 2, 2017, the parties signed a second Statement of Work to upgrade the "software

7   product and license from the SFMC Professional Edition to the SMFC Corporate Edition."[36] "The

8   2017 SOW additionally contemplated that Thirty-One Gifts was purchasing a 'MobilePush'

9   product and that Pierry would implement functionality."[37]

10       The SOW "contemplated Pierry's monitoring of potential overages relating to Pierry's

11  prospective forecasting of any such overages for discussion with Thirty One Gifts."[38] It set forth

12  quarterly payments for the upgrade, with a term beginning on February 1, 2017 through January

13  31, 2019. "Invoicing for quarterly payments was set for a net 30 payment schedule. Thus, an

14  invoice for May 1, 2017 was due to be paid on May 31, 2017."[39]

15       The SOW specifies that "The client [Thirty-One Gifts] owns the application, all related code,

16  and maintenance."[40] According to Thirty-One Gifts, its "ownership of the SFMC application was

17  critical because that application controlled all of the data that Thirty-One Gifts was temporarily

18  providing to Pierry to perform email marketing services. Although Thirty-One Gifts owned the

19  application, Thirty-One Gifts relied on Pierry to operate the application – that was the purpose of

20  entering into the MSAs and the SOWs."[41] "Unbeknownst to Thirty-One Gifts, Pierry also retained

21  a "lock" on the application. Thirty-One Gifts never authorized Pierry to lock the application

22

23  [34] *Id.* at 6 (¶ 28).

    [35] *Id.*

24  [36] *Id.* (¶ 30).

25  [37] *Id.* (¶ 31).

26  [38] *Id.* (¶ 32); Ex. 3, SOW – ECF No. 51 at 22 (§§ e, f).

    [39] FACC – ECF No. 49 at 6 (¶ 33); Ex. 3, SOW – ECF No. 51 at 21.

27  [40] FACC – ECF No. 49 at 6 (¶ 34); Ex. 3, SOW – ECF No. 51 at 21.

28  [41] FACC – ECF No. 49 at 6 (¶ 34).

against Thirty-One Gifts' use."[42] The MSA and the two SOWs do "not reflect any agreement that Pierry could charge for, or that Thirty-One Gifts is responsible to pay for, additional hours Pierry spent to implement its obligations under the MSA, the 2015 SOW, and/or the 2017 SOW."[43]

### 5. March 2017: Pierry Closes its Cleveland Office

Representatives at Pierry's (formerly C.Trac's) Cleveland, Ohio office handled the work for Thirty-One Gifts from September 2016 to March 2017.[44] Thirty-One Gifts "helped train those representatives in the business of digital marketing in the direct selling context."[45] In late March 2017, Pierry closed the Cleveland office and did not notify Thirty-One Gifts, which discovered the closure after leaving "numerous urgent messages with the Cleveland office" in late March with no response.[46] On information and belief, Thirty-One Gifts alleges that Pierry terminated the representatives who handled Thirty-One Gifts' account and assigned "new representatives who were located on or near the West Coast and had little to no knowledge of the Thirty-One Gifts account."[47]

"After the reassignment of personnel, Pierry's performance of the MSA and the SOWs materially and dramatically worsened."[48] The new representatives did not understand the account.[49] Thirty-One Gifts consultants paid a subscription fee for weekly activity reports from Pierry, but after the Cleveland office closed, Pierry "struggled to send" the reports.[50] Thirty-One Gifts suspended the report service to its consultants "due to the confusion caused by Pierry's incorrect reporting."[51] Problems arose "relating to other email messages that Pierry was required

---

[42] *Id*. at 7 (¶ 35).

[43] *Id*. at 5 (¶ 26).

[44] *Id*. at 7 (¶ 37).

[45] *Id*. (¶ 38).

[46] *Id*. (¶ 39).

[47] *Id*. (¶ 40).

[48] *Id*. (¶ 41).

[49] *Id*.

[50] *Id*. at 8 (¶ 44).

to send to Thirty-One Gifts' distributions list," and "weeks would pass and deadlines would be missed before Pierry responded."[52]

Thirty-One Gifts asked Pierry to send its personnel to Thirty-One Gifts' office so that Thirty-One Gifts could educate the personnel on its business model and products and explain how the Pierry/C.Trac Cleveland-office personnel previously handled the account.[53] It also asked for phone or videoconference training sessions.[54] Pierry ignored or refused the requests.[55]

Thirty-One Gifts specifies 20 instances ("a sampling") of "Pierry's recognition of its repeated mistakes and ongoing apologies" in March and April 2017.[56]

### 6. April 2017: Thirty-One Gifts' Flash Sale

Thirty-One Gifts holds "flash sales" twice a year for its consultants and customers.[57] The flash sales "last a relatively short duration and are based on a 'while supplies lasts' model where most sales occur on the first day."[58] These sales "reflect some of Thirty-One Gifts' highest sales volume days each year."[59] Thirty-One Gifts' "traditional strategy" was to open the flash sale first to consultants and "best" customers, and then later to the master list of customers, thus "segmenting and sequencing the lists."[60]

Thirty-One Gifts set a flash sale to begin on April 26, 2017 at 6:00 a.m.[61] Pierry's "failures since closing its Cleveland office" eroded Thirty-One Gifts' confidence that Pierry could

---

[52] *Id.* (¶ 45).
[53] *Id.* (¶ 42).
[54] *Id.* (¶ 43).
[55] *Id.* (¶¶ 42–43).
[56] *Id.* (¶ 43).
[57] *Id.* at 10 (¶ 47).
[58] *Id.*
[59] *Id.* at 11 (¶ 49).
[60] *Id.* (¶¶ 51, 53).
[61] *Id.* at 11 (¶ 50).

differentiate between its different customer lists because Pierry had on previously occasions "sent emails to incorrect distribution lists," "sent test emails that were accurate but then changed the substantive emails when distributed," and "sent emails to Thirty-One Gifts' distribution lists without Thirty-One Gifts' approval."[62]

Because of these alleged problems with Pierry's ability to send emails, for the April 26 flash sale, Thirty-One Gifts asked Pierry to send emails only to its master customer list (instead of "segmenting and sequencing the lists").[63] Thirty-One Gifts asked Pierry to send test emails to the master customer list to confirm its preparation for April flash-sale.[64] As of April 24, 2017, "Pierry was still unable to produce an accurate test email:" the test emails had incorrect URL addresses and hyperlinks.[65] Thirty-One Gifts wrote to Pierry, saying that they had to turn the situation around so that the parties could "have confidence" in the contemplated marketing-email send.[66] Pierry's next tests emails on April 25 failed too; they again had incorrect URL addresses and hyperlinks.[67] Thirty-One Gifts devoted "substantial extra time and attention" at "substantial extra cost" to ensure that Pierry would send the correct emails, but on the date of the flash sale, "Pierry failed nonetheless."[68]

In the early morning on April 26, Pierry told Thirty-One Gifts that "the initial email sends were all successful."[69] But over the next hours, the "purchasing activity from the flash sale was far below forecasts and previous flash sales."[70] Thirty-One Gifts investigated and discovered that Pierry had only sent approximately 750,000 of the approximately 5 million emails that it was

---

[62] Id. (¶ 52).

[63] Id. (¶ 53).

[64] Id. at 12 (¶ 55).

[65] Id. (¶ 56).

[66] Id. (¶ 57).

[67] Id. (¶ 58).

[68] Id. (¶ 59–60).

[69] Id. (¶ 61).

[70] Id. (¶ 62).

United States District Court
Northern District of California

supposed to send.[71] Thirty-One Gifts informed Pierry of the "mistake."[72] By 11:52 a.m. ET, Pierry

responded, "you are absolutely correct that the [list Pierry used] is not inclusive of all Customers.

We sincerely apologize for the misstep, and are working to correct this right away. We expect to

have remaining emails deployed by 12:30 pm EST, at the latest, pending your approval."[73] By

3:40 p.m. ET (ten hours after the target time to send the emails), Pierry allegedly sent emails to

only fifty percent of the distribution list.[74]

As a result, Thirty-One Gifts claims, it lost at least $2.2 million of revenue.[75]

### 7. May 2017: Thirty-One Gifts Terminates the Contract

On May 12, 2017, Thirty-One Gifts sent Pierry a "Formal Notice of Termination" that it was

terminating the contract and its business relationship immediately and that it would not pay

Pierry's invoices for April or May 2017:[76]

> Thirty-One Gifts is terminating the Agreement and its business relationship with
> Pierry. Pursuant to §2.2 of the Agreement, this letter gives formal <u>Notice</u> that
> Thirty-One Gifts will not pay any Pierry invoices for April or May of this year due
> to Pierry's wholesale failure to perform its contractual obligations during those
> months, resulting in exponentially more monetary harm to Thirty-One Gifts than
> the value of any invoices from Pierry.[77]

The notice reviewed Pierry's alleged breaches of the contracts, including its deficiencies regarding

the April 26 sale, and it also stated that Pierry had charged Thirty-One Gifts overage charges

without approval:

> Additionally, I understand Pierry has sent Thirty-One Gifts various inconsistent
> demands for alleged overages of hours over the first quarter of this year. Those
> overages were never approved and were not authorized by the Agreement.
> Moreover, I understand that Pierry informed Thirty-One Gifts on April 4, 2017 that

---

[71] *Id.* (¶ 63).

[72] *Id.*

[73] *Id.* at 12–13 (¶ 64). The order's usage of "ET" and "EST" tracks the FACC's nomenclature.

[74] *Id.* at 13 (¶ 66).

[75] *Id.* (¶ 69).

[76] *Id.* (¶ 71); Letter, Ex. A – ECF No. 52 at 2–4.

[77] Letter, Ex. A – ECF No. 52 at 3.

Pierry would not be charging any overages to Thirty-One Gifts in light of Pierry's breaches of the Agreement (which breaches only worsened later in the month).[78] The notice "recognize[d] § 7.1 of the Agreement" (the provision that limits liability, *see* supra), but asserted that section 7.1's thirty-day-notice-and-cure provision "is inoperative when the breached performance is incapable of re-performance within thirty days — plainly a biannual flash sale is incapable of re-performance thirty days later."[79]

"Pierry responded by demanding that, unless Thirty-One Gifts pays Pierry $280,772.20 by May 19, 2017, Pierry was going to lock out Thirty-One Gifts from the SFMC software application that Thirty-One Gifts owned and lock out Thirty-One Gifts from recovering its property related to the account."[80] Thirty-One Gifts did not make the payment and disputes that it owed it under the MSA or the SOWs because the amounts were attributable to extra work hours.[81] On May 19, 2017, Pierry locked Thirty-One Gifts out of the SFMC software application and account, allegedly on the ground that it could suspend service for lack of payment.[82]

As a result, Thirty-One Gifts could not conduct its business: it could not communicate with its sales consultants and its customers; it could not advertise sales and promotions; and it could not address customer-service issues.[83]

"The tens of thousands of consultants were also harmed" and could not communicate with their customers effectively or raise issues with Thirty-One Gifts.[84] Pierry harmed them further "by failing to implement email services for which the consultants paid a subscription fee."[85]

Pierry also "harmed the public at large. The consuming public could not communicate effectively" with Thirty-One Gifts and "could not communicate effectively with their chosen

---

[78] *Id.*

[79] FACC – ECF No. 49 at 14 (¶ 72); Letter, Ex. A – ECF No. 52 at 3.

[80] FACC – ECF No. 49 at 14 (¶ 73); *see* FAC – ECF No. 51 at 3 (¶ 9).

[81] FACC – ECF No. 49 at 14 (¶¶ 74–75).

[82] *Id.* at 14–15 (¶ 77).

[83] *Id.* at 15 (¶ 78).

[84] *Id.* (¶ 79).

[85] *Id.*

consultants regarding purchases, sales, and customer services."[86] Thirty-One Gifts could not communicate with customers to inform them of monthly specials and to follow up regarding sales.[87] It was blocked from confirming enrollment of new consultants.[88]

Thirty-One Gifts tried to resolve the dispute with Pierry and asked Pierry to "return its property (most critically the Internet Protocol address, message content, and customer lists."[89] "Pierry responded by insisting upon full payment of the un-owed $289,772.20 in exchange for releasing the lock on Thirty-One Gifts' account."[90]

## 8. The Lawsuit

In May 2017, Pierry sued Thirty-One Gifts for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) declaratory relief.[91] Thirty-One Gifts counterclaimed for (1) breach of contract, (2) declaratory judgment, (3) violation of California's Computer Data Access and Fraud Act, Cal. Pen. Code § 502, (4) conversion, (5) intentional interference with prospective economic advantage, and (6) violation of California's UCL, Cal. Bus. & Prof. Code § 17200.[92] The parties each filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). Thirty-One Gifts moved to dismiss Pierry's second claim for breach of the implied covenant of good faith and fair dealing,[93] and Pierry moved to dismiss all counterclaims except for the claim for declaratory judgment; it also moved to dismiss any claim for damages that exceeded the limitation of liability in the MSA.[94]

---

[86] *Id.* (¶ 80).

[87] *Id.* (¶ 81).

[88] *Id.* (¶ 82).

[89] *Id.* (¶ 84).

[90] FAC – ECF No. 51 at 2 (¶ 5).

[91] Compl. – ECF No. 1 at 4–6 (¶¶ 13–28).

[92] Answer and Counterclaims – ECF No. 8.

[93] Mot. – ECF No. 7.

[94] Mot. – ECF No. 15.

The case previously was assigned to a different judge. She dismissed the claim and counterclaim for breach of the implied covenant of good faith and fair dealing because the claims duplicated the parties' breach-of-contract claims.[95] She dismissed Thirty-One Gifts' breach-of-contract counterclaim "[t]o the extent the breach of contract claim is based on Pierry's failure to perform services as defined in the MSA" because Thirty-One Gifts failed to plead "compliance with the condition precedent of providing notice and opportunity to cure in compliance with MSA §§ 5.2 and 7.1."[96] She let the claim stand to the extent that it challenged Pierry's failure to return Thirty-One Gifts' property, its blocking of Thirty-One Gifts' access to its property (including the SFMC application), and Pierry's demand for monies that it was not entitled to under the contract.[97] She dismissed the UCL claim.[98] She otherwise denied Pierry's motion to dismiss the other counterclaims.[99] The dismissal was with leave to amend.[100]

## 9. The Amended Complaint and Counterclaims

Pierry filed an amended complaint with three claims: (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; and (3) a claim for a declaratory judgment that Thirty-One Gifts owes it immediate payment of the past-due amount.[101]

Thirty-One Gifts asserts six amended counterclaims: (1) breach of contract; (2) declaratory judgment; (3) violation of California's Computer Data Access and Fraud Act, Cal. Pen. Code § 502; (4) conversion; (5) intentional interference with prospective economic advantage; and (6) violation of California's UCL, Cal. Bus. & Prof. Code § 17200. Thirty-One Gifts moves to

---

[95] Order – ECF No. 35 at 11, 18.

[96] *Id.* at 11.

[97] *Id.*

[98] *Id.* at 14–15.

[99] *Id.* at 14.

[100] *Id.* at 18.

[101] FAC – ECF No. 51 at 4–8 (¶¶ 12–29).

dismiss Pierry's claim for breach of the implied covenant of good faith and fair dealing.[102] Pierry moves to dismiss Thirty-One Gifts' counterclaims three through six.[103]

## ANALYSIS

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a claim for relief above the speculative level . . . ." *Id.* (internal citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, which when accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

If a court dismisses a complaint, it should give leave to amend unless the "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

---

[102] Mot. – ECF No. 53.

[103] Mot. – ECF No. 56.

ORDER – No. 17-cv-03074-LB

1    **1. Thirty-One Gifts' Motion to Dismiss**

2       Thirty-One Gifts moves to dismiss Pierry's claim for breach of the implied covenant of good

3 faith and fair dealing on the ground that it duplicates the breach-of-contract claim.[104] The court

4 dismisses the claim.

5       California law implies a covenant of good faith and fair dealing in every contract. *Carma*

6 *Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371 (1992). "'The obligations

7 imposed by the covenant of good faith and fair dealing are not those set out in the term of the

8 contract itself, but rather are obligations imposed by law governing the manner in which the

9 contractual obligations must be discharged-fairly and in good faith.'" *Dunkel v. eBay, Inc.*, No.

10 5:12-CV-01452-EJD, 2013 WL 415584, at \*9 (N.D. Cal. Jan. 31, 2013) (quoting *Koehrer v. Sup.*

11 *Ct.*, 181 Cal. App. 3d 1155, 1169 (1986)). "However, the contours of any party's duty under the

12 covenant, as well as any conduct prohibited by the covenant, are determined by the purposes and

13 terms of the contract at issue." *Id.* (citing *Inter–Mark USA, Inc. v. Intuit, Inc.*, No. 07-CV-04178-

14 JCS, 2008 WL 552482, at \*7 (N.D. Cal. Feb. 27, 2008) (quoting *Commercial Union Assurance*

15 *Cos. v. Safeway Stores, Inc.*, 26 Cal. 3d 912, 918 (1980) and *Carma Developers*, 2 Cal. 4th at

16 373)). Thus, "[i]n order to state a claim for breach of an implied covenant of good faith and fair

17 dealing, the specific contractual obligation from which the imposed covenant of good faith and

18 fair dealing arose must be alleged." *InterMark USA*, 2008 WL 552482 at \*6. A plaintiff also must

19 show "that the conduct of the defendant, whether or not it also constitutes a breach of a consensual

20 contract term, demonstrates a failure or refusal to discharge contractual responsibilities." *Careau*

21 *& Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990).

22       "If the allegations in a breach of implied covenant claim do not go beyond the statement of a

23 mere contract breach and, relying on the same alleged acts, simply seek the same damages or other

24 relief already claimed in a companion contract cause of action, they may be disregarded as

25 superfluous as no additional claim is actually stated." *Malcolm v. JP Morgan Chase Bank, N.A.*,

26

27

---

28   [104] Motion – ECF No. 53 at 2.

No. 09-CV-4496-JF (PVT), 2010 WL 934252, at *6 (N.D. Cal. Mar. 15, 2010) (quoting *Schulken v. Wash. Mut. Bank*, No. 09-CV-02708-JW, 2009 WL 4173525 (N.D. Cal. Nov. 19, 2009)).

In its amended complaint, Pierry adds new allegations to support its claim of a breach of the covenant of good faith and fair dealing. The core allegation is that Thirty-One Gifts needed to cooperate and dedicate ongoing technical support and other resources in order for Pierry to perform under the contract.[105] Pierry points to specific contract provisions that "implicitly require [Thirty-One Gifts'] good faith cooperation and support."[106] An example is that Pierry provided consulting services, which required Thirty-One Gifts' active involvement. Another is that the creation of content (by Pierry or Thirty-One Gifts) required Thirty-One Gifts to provide content and allow effective access.[107]

The allegations that support the contract and breach-of-implied-covenant claims are the same: (1) Thirty-One Gifts did not pay Pierry for contractual work; and (2) Thirty-One Gifts did not dedicate on-site technical support or other resources to Pierry.[108] The claim for breach of the implied covenant of good faith and fair dealing is superfluous. *Careau*, 222 Cal. App. 3d at 1394.

Pierry nonetheless contends that it alleged sufficiently the contract provisions that required Thirty-One Gifts' good-faith cooperation and support and that it specified "implied obligations not stated in the contract" that Thirty-One Gifts did not satisfy.[109] This does not change the court's conclusion. Pierry relies on the contract and does not plead "facts that show that the on-site support and resources are separate obligations not stated in the contract."[110] The court thus dismisses the claim for breach of the implied covenant of good faith and fair dealing because it duplicates the contract claim.[111]

---

[105] FAC – ECF No. 51 at 5 (¶ 21).

[106] *Id.*

[107] *Id.*

[108] FAC – ECF No. 51 (¶¶ 16, 21–22).

[109] Opp. – ECF No. 61 at 12, 15.

[110] Order – ECF No. 35 at 9.

[111] The court finds the issue suitable for determination at the pleadings stage (as opposed to summary judgment). *See, e.g.*, *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694, 715–17 (N.D. Cal. 2014); *Paed v. Wells Fargo Bank, N.A.*, No. C-15-01980, 2015 WL 4089983, at *4–*5 (N.D. Cal. July 6,

1

## 2. Pierry's Motion to Dismiss

Pierry moves to dismiss the following counterclaims (numbered as they are in the counter-complaint): (3) violation of California's Computer Data Access and Fraud Act, Cal. Pen. Code § 502; (4) conversion; (5) intentional interference with prospective economic advantage; and (6) violation of California's UCL, Cal. Bus. & Prof. Code § 17200. It also moves to dismiss Thirty-One Gifts' claims for any damages that exceed the liability limitation and special damages exclusion in the MSA.[112]

### 2.1 California Comprehensive Computer Data Access and Fraud Act

Thirty-One Gifts alleges that Pierry violated the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, by preventing Thirty-One Gifts from using its data.[113] Pierry moves to dismiss on the ground that Thirty-One Gifts did not plead an unlawful taking or causation.[114] The court holds that Thirty-One Gifts pleads a plausible claim.

The Act prohibits an individual from knowingly accessing or using data without permission in various ways:

> (c) Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense:
>
> (1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.
>
> (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.
>
> (3) Knowingly and without permission uses or causes to be used computer services.

---

2015); *Williams v. Gyrus ACMI, LP*, No. 14-cv-805, 2015 WL 154733, at *3–*4 (N.D. Cal. Jan. 12, 2015); *Lamke v. Sunstate Equipment Co.*, LLC, 387 F. Supp. 2d 1044, 1047–48 (N.D. Cal. 2004); *Bilodeau v. McAfee, Inc.*, No. 12-cv-4589, 2013 WL 3200658, at *13 (N.D. Cal. June 24, 2013).

[112] Mot. – ECF No. 50.

[113] FACC – ECF No. 49 at 21–22 (¶¶ 107–11).

[114] Mot. – ECF No. 56 at 9–11.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

\* \* \*

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

Cal. Penal Code § 502(c)(1)–(5), (7). An individual acts "without permission" when he "circumvents technical or code-based barriers in place to restrict or bar a user's access." *Facebook v. Power Ventures, Inc.*, 844 F. Supp. 2d 1025, 1036 (N.D. Cal. 2012). Anyone "who suffers damage or loss by reason of a violation" may bring a private action for damages and equitable relief. Cal. Penal Code § 502(e)(1).

Pierry moves to dismiss the claim on the grounds that (1) the contract authorized it to suspend access, (2) Thirty-One Gifts did not allege causation sufficiently, and (3) Thirty-One Gifts did not allege an "actual use or taking" that establishes a violation of the statute.[115] The court follows as persuasive the earlier judge's order on this issue and holds that Thirty-One Gifts plausibly pleads a claim under section 502.

First, suspension of service is a remedy under MSA § 2.2 only for non-payment of an undisputed debt, and this debt was disputed: Thirty-One Gifts asserts that the disputed fees were for extra hours that Pierry worked that were not covered by the contract. Also, Thirty-One Gifts alleges more than suspension of services: it alleges that Pierry locked it out of its sales platform and prevented it from conducting its online business.[116] This plausibly alleges causation and harm.

In addition, Thirty-One Gifts pleads a use or taking. The Act prohibits a person who "without permission, takes, copies, or makes use of" data on a computer. Cal. Penal Code § 502(c)(2). This "includes logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly." *United States v. Christensen*, 828 F.3d 763, 789

---

[115] Mot. – ECF No. 56 at 9–11.

[116] Order – ECF No. 35 at 12.

(9th Cir. 2015). Subsection 502(c)(5) makes anyone liable who "[k]nowingly and without permission disrupts or causes the disruption of computer services or denies or causes denial of computer services to an authorized user of a computer, computer system, or computer network." This includes locking an individual out of an account without authorization. *NovelPoster v. Javitch Canfield Group*, 140 F. Supp. 3d 954, 967 (N.D. Cal. 2014); *see People v. Childs*, 220 Cal. App. 4th 1079, 1089 (2014) (city engineer violated the Act when he disrupted the customer's access to the city's fiber-optic network). Thirty-One Gifts' allegations are therefore sufficient to state a claim under the Act.

### 2.2 Conversion

Pierry argues that because the MSA allowed it to suspend service, Thirty-One Gifts cannot plead a claim for conversion.[117]

"[A]ny act of dominion wrongfully exerted over the personal property of another inconsistent with the owner's rights thereto constitutes conversion." *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010) (quoting *McCafferty v. Gilbank*, 249 Cal. App. 2d 569, 576 (1967)). To prove conversion, a plaintiff must establish: (1) "ownership of or right to possess the property in question at the time of the conversion, (2) that the defendant disposed of the plaintiff's property rights or converted the property by a wrongful act, and (3) damages." *Swingless Golf Club Corp. v. Taylor*, 732 F. Supp. 2d 899, 910 (N.D. Cal. 2010) (citing *Oakdale Village Grp. v. Fong*, 43 Cal. App. 4th 539, 544 (1996)).

As discussed in the last section, Thirty-One Gifts alleged that Pierry prevented it from using its sales platform and data. This plausibly pleads a claim for conversion.

### 2.3 Intentional Interference with Economic Advantage

Pierry argues that because the MSA allowed it to suspend service, Thirty-One Gifts cannot plead a claim for intentional interference with prospective economic advantage.[118]

---

[117] FACC – ECF No. 49 at 22–23 (¶ 117).

[118] Mot. – ECF No. 56 at 15.

United States District Court
Northern District of California

1    "In order to succeed on a claim for intentional interference with prospective economic

2    advantage, a plaintiff must prove: (1) it had an economic relationship with a third party containing

3    the probability of a future economic benefit; (2) defendant had knowledge of this relationship; (3)

4    defendant committed intentional and unjustified acts designed to disrupt the relationship; (4)

5    actual disruption of the relationship; and (5) resulting damages." *Sidense Corp. v. Kilopass Techn.*

6    *Inc.*, No. C 11-04112-SI, 2012 WL 3545289, at *13 (N.D. Cal. Aug. 16, 2012). The plaintiff must

7    allege that the defendant performed an act that is "wrongful 'by some measure beyond the fact of

8    the interference itself.'" *CRST Van Expedited, Inc. v. Werner Enters. Inc.*, 479 F.3d 1099, 1105

9    (9th Cir. 2007).

10    By alleging that Pierry denied it access to its sales platform, and otherwise pleading facts

11    establishing the elements of a claim for intentional interference with prospective economic

12    advantage, Thirty-One Gifts states a claim.

13    **2.4 California's UCL, Cal. Bus. & Prof. Code § 17200 *et seq.***

14    The previously assigned judge dismissed the UCL claim because this case is at core about a

15    contract dispute between sophisticated parties. "The UCL may be used to vindicate the rights of

16    individual consumers who are parties to a contract, but it is not generally appropriate for resolving

17    sophisticated business finance issues."[119] The earlier assigned judge dismissed the claim with

18    leave to amend to add fact allegations about harm to the general public.[120] Because the allegations

19    supporting the amended complaint do not cure the deficiencies identified in the earlier judge's

20    order dismissing the claim, the court dismisses the claim.

21    "[W]here a UCL action is based on contracts not involving either the public in general or

22    individual consumers who are parties to the contracts, a corporate plaintiff may not rely on the

23    UCL for the relief it seeks." *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115,

24    135 (2007); *see also Rosenbluth Int'l, Inc. v. Super. Ct.*, 101 Cal. App. 4th 1073, 1077 (2002)

25    ("[A] UCL action based on a contract is not appropriate where the public in general is not harmed

26

27    [119] Order – ECF No. 34 at 14 (citation omitted).

28    [120] *Id.* at 15–16.

by the defendant's alleged unlawful practices."); *ILWU-PMA Welfare Plan Bd. of Trustees v. Connecticut General Life Ins. Co.*, No. C-02965-WHA, 2015 WL 9300519, at \*12 (N.D. Cal. Dec. 22, 2015) (dismissing a UCL claim because it arose "solely from defendants' performance of their respective contracts, and no individual consumers joined those contracts as parties"). The "central issue . . . is whether the public at large, or consumers generally, are affected by the alleged unlawful business practice of defendants. The relative size of the plaintiff companies and whether or not there is a contract for the plaintiffs to rely upon is secondary to the analysis of whether, as a result of the alleged unfair or fraudulent business practice, consumers are adversely affected." *In re Webkinz Antitrust Litigation*, 695 F. Supp. 2d 987, 998–99 (N.D. Cal. 2010).

Thirty-One Gifts argues that its UCL claim "is based on misconduct independent of a contract between the parties,"[121] but the dispute remains about a contract negotiated by sophisticated entities. The court follows as persuasive the earlier judge's opinion and concludes that Thirty-One Gifts' new allegations about harm to the public and its consultants do not establish injury covered by the UCL. (The court can distinguish *Circle Click Media*, which involved misleading and deceptive acts and plaintiffs who were not uniformly sophisticated. *See Circle Click Media LLC v. Regus Mgmt. Grp.*, 2015 WL 6638929, at \*1–\*2 (N.D. Cal. Oct. 30, 2015)). The court thus dismisses the claim.

### 2.5 Contractual Limitations on Damages

Pierry moves to dismiss Thirty-One Gifts' counterclaims for damages that exceed the liability limitation and special-damages exclusion in the MSA.[122] The court denies the motion.

Contractual liability limitations are subject to California Civil Code section 1668, which declares contrary to the policy of the law "contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent." Under California law, "contractual clauses seeking to limit liability will be strictly construed and any ambiguities

---

[121] Opp. – ECF No. 60 at 16. The contract provisions are excerpted in the Statement.

[122] Mot. – ECF No. 56 at 17–18.

1 | resolved against the party seeking to limit its liability." *Rodman v. Safeway Inc.*, 125 F. Supp. 3d
2 | 922, 928 (N.D. Cal. 2015) (citations omitted).

3 |     The court follows the earlier judge's order as persuasive and holds that the MSA provisions
4 | that limit damages may apply to some conduct (such as damages based on services) but do not
5 | apply to damages based on willful injuries or violations of the Penal Code.[123]

## CONCLUSION

8 |     The court grants Thirty-One Gifts' motion to dismiss, grants Pierry's motion to dismiss the
9 | UCL claim, and otherwise denies Pierry's motion. Given the earlier trial judge's dismissal with
10 | leave to amend, the court's dismissals are without leave to amend. The parties have made their
11 | best efforts, and they did not cure the deficiencies that the previous judge identified. That means
12 | that the claims going forward are as follows. Pierry's claims: (1) breach of contract and (3)
13 | declaratory relief. Thirty-One Gifts' counterclaims: (1) breach of contract; (2) declaratory
14 | judgment; (3) violation of California's Computer Data Access and Fraud Act, Cal. Pen. Code
15 | § 502; (4) conversion; and (5) intentional interference with prospective economic advantage.
16 |     This disposes of ECF Nos. 53 and 56.

17 | **IT IS SO ORDERED.**

18 |     Dated: April 5, 2018

LAUREL BEELER
United States Magistrate Judge

---

[123] Order – ECF No. 35 at 17.